[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action brought pursuant to C.G.S. Sec. 46b-59, seeking visitation, specific visitation, and any other relief in law or equity as may appertain. The file does not contain an answer to the complaint, but the defendants appeared pro se and by counsel, and the matter was referred to Family Services on June 25, 1993, by the court, Harrigan, J.
The defendant, Darryl Hammond, appeared pro se, but did not appear for any further proceedings in this action because of other actions against him which were determinative of his rights to be heard in this action.
The plaintiff and the defendant were seen by Family Services for what appeared to be mediation and thereafter, the court referred to Family Services again on November 11, 1993. Family Services was again ordered to intervene to do a custody study and to evaluate, on an interim basis. They reported on October 12, 1994, that during the pendency of their study no visitation should occur. That issue was assigned to Ms. Copes CT Page 2332 on December 8, 1993, and there does not appear to be any specificity with respect to the order of April 13, 1994. No further action was taken by the court, until the report of Family Services was filed on January 12, 1995, and the matter scheduled from the mandatory appearance of the parties on short calendar. The court heard testimony on February 7 and 8, 1995.
The paternal grandmother of two children seeks the right to visit. The father of these children, Darryl Thomas Hammond, born August 10, 1963 in Bridgeport, has had his parental rights terminated, following a conviction for two counts of risk of injury to a minor, and two counts of sexual abuse in the third degree. The defendant is divorced from the father, and has sole custody of these children.
The plaintiff grandmother is a retired school teacher, retired from the Waterbury public school system. She testified that she never had issued against her a complaint concerning improper discipline of any youngster in her charge.
She testified that she saw her grandchildren each Sunday for dinner between the hours of 1:30 and 5:30 p.m. prior to January of 1991, when allegations were brought against their father, her son. She testified that the children were very happy and active. She further testified that she visits her two other sons and their children in Germany and Florida, respectively, on a frequent basis, considering the distances, and has a warm and loving relationship with each of her grandchildren.
She testified that her one attempt to contact the children who are the subject of this action was unsuccessful. Christmas gifts that were given to the children's attorney were rejected. Her attempt to talk to her former daughter-in-law and her mother were also unsuccessful. She testified that she was not present nor did she participate in any of the abuse to which their father entered nolo contendere pleas.
The paternal grandmother testified that she wanted the children to grow up knowing that they have a loving grandmother, and an extended family. She indicated that she had a mutual friend who had offered her home as a place for some visitation, which would accommodate the presence of the children's mother as well.
The children have not visited with their paternal cousins, CT Page 2333 and their grandmother would love them to know their cousins. She testified that she did not want them to cheated by not knowing her or their family.
In cross examination, the plaintiff recalled being in court, and the representation by the prosecutor that as a part of the plea bargain, the grandmother had agreed not to seek visitation with the children. The representation was made on the record. The plea bargain called for a suspended sentence, and the defendant mother of these children relied on that aspect of the plea bargain. The transcript of that proceeding appears as Defendant's Exhibit 1, and the purported agreement of the plaintiff appears on page 12. The legal effect of that representation was not argued by counsel, who conceded that the court did not have in personam jurisdiction over the plaintiff. Her intent not to seek visitation during the period of probation, coupled with her admitted activity after the completion of the criminal proceedings was of concern to the court.
The grandmother testified that despite his plea, and despite the termination of his parental rights in the Probate Court, and despite her reading of certain psychological reports, she believes that her son is innocent and nothing happened to her grandchildren. She testified that she was hurt deeply that the children had claimed that abuse occurred in her home, that their mouths were taped shut while they were in her home and that she knew it. Her son was residing in her home, and had unsupervised visitation with the children.
During the cross-examination, plaintiff testified that she spoke to the Family Relations officer who completed the visitation study, and indicated that there was a conspiracy to prevent her from visiting the children. She made several calls to determine the well-being of the children. The plaintiff, within two (2) weeks of the criminal proceeding, called members of the defendant's community to discuss the defendant's ability as a parent.
Shortly after her son's plea, the plaintiff accessed the defendant's minister, so that her son could tell him "his side of the story." Apparently, the opportunity to do that at trial was avoided, but she persisted in affording him an opportunity to tell "his side of the story" without being subject to cross-examination. She did not perceive that her approach to the defendant's minister would be any problem to the defendant. CT Page 2334
The plaintiff called her local Wolcott minister to testify concerning her reputation in her community. He referred to her as outstanding and moral in her church community life, and in all ways. "Four stars" is how he characterized her. While he had observed her at church social functions with other grandchildren, he did not know the children who are the subject of this action.
Certain medical reports were marked as Defendant's Exhibits 2 and 3. They are, respectively, a social work interview of the children, dated February 22, 1991, and a 7 page medical report, both from Yale New Haven Hospital. Those reports depict medical findings which verify sexual abuse. The court has had the opportunity to review the medical findings, the drawings of the pre-pubescent hymen of Christa, and its obvious abnormalities. In light of the fact that the court has heard experts testify in other matters concerning the gynecological findings in prepubertal females, the report from Yale that their findings were significant for the presence of sexual abuse were quite persuasive to the court. In light of the findings, it is clear to the court that the medical findings are credible and lead the court to the conclusion that the statements made by Christa, first to a speech therapist and not to her mother, were credible. The belief of the plaintiff that her son was not responsible for the sexual abuse of his daughter is not well-founded, and if maintained, could be very damaging to Christa's self-esteem, and her need to be supported by the adults around her.
A visitation study was conducted by the Family Services Unit. Sharon Copes conducted that evaluation, and testified at the hearing. She has been employed as such for twelve (12) years, and has completed many such studies, and evaluations. She testified that the plaintiff had been interviewed and that she supplied written material. The defendant was interviewed and Ms. Copes conducted two home visits, once at the maternal grandmother's home, after school, while mother was not present.
Ms. Copes testified that the children did disclose sexual abuse to her during those interviews. They talked with her about the abuse on both occasions, and said that they remembered their father, who Christa referred to as her "ex-daddy". She said he touched her with a fork or a knife, threw her against the wall, and he peed in her brother's mouth. Her brother CT Page 2335 corrected her. Both were able to recall what dad and his girlfriend looked like and said they had fun with them when other people were around, but if they were left alone with them, they touched them.
During the second interview, Christa complained that grandmother Shirley had put her mouth on her vaginal area, and that at Hubbard Park, plaintiff photographed the children and dad, after dad had just touched them. When asked if they were "reminded" of these things, they said yes. They expressed not wanting to see their grandmother.
The children were upset during the interview, according to Ms. Copes and would become more upset when issues of abuse were brought up. While they were seen in counseling shortly after the allegations of abuse were originally brought, and during the criminal process, the children currently are in a self-esteem support group at school. They are not currently involved in any other formal therapy.
During cross-examination, the witness indicated that Mr. and Mrs. Hammond had been referred to Family Services, because of the arrest of Mr. Hammond for a family violence crime in 1987. At that time, there was no discussion or involvement of the plaintiff in this action. The concerns of inappropriate sexual interest in the minor child, Christa, was discussed, however. The parties were divorced in December of 1987. No complaints were made which resulted in Family Services intervention until 1991, when the father was arrested.
Ms. Copes recommends that plaintiff not visit with the children at this time. The children currently believe that she abused them, even though the evidence is slight that that occurred. However, they expressed that dad abused them while she was in the home where they were abused, and at the time the abuse occurred. Ms. Copes expressed her concern that the children lacked trust in this person. Furthermore, the plaintiff is so committed to her son's innocence, and attempting, after trial, to demonstrate that, that she would be unable to refrain from communicating that to her grandchildren. The court is also concerned that her actions in the past to vindicate her son demonstrate a powerful need, in her, to prove his innocence, despite a criminal conviction and termination of his parental rights. Her expressions, in her own testimony, of wanting the children to know their grandmother, conveyed an CT Page 2336 articulation of her own needs over those of her grandchildren.
Ms. Copes testified that despite the fact that they had been "reminded" that incidents of abuse occurred, she did not feel that they had been manipulated into asserting that they had been abused in 1991. Their allegations against dad have been consistent since that time. While Ms. Copes expressed concerns about allegations against plaintiff, which also predate this proceeding, she did not feel that they could be sustained. The children's expression of discomfort with grandmother were genuine, and not manipulated.
The report outlines the concerns of the parties, and contains expected reports of the rigidity of the respective positions of the parties. Of concern to the court is the ability of the children to move through the experience of the abuse, the experience of the secondary trauma of evaluation and court preparation. The report indicates that they have, in fact, been able to deal with their real lives, and put this matter into the past. The concern is the reintroduction of the topic into their lives by the presence of the grandmother. The defendant expressed that concern, and felt that she and her mother had worked hard to get the children through this experience.
Doris Smith, maternal grandmother testified. She resides in Beacon Falls, and cares for the children before school and on any weekends when their mother is required to work. She drives them to school, and is available after school if mom cannot.
She indicated that Christa was touching her clitoris, and the witness told her to stop. Christa replied that her daddy touched her there, and afterward smelled her fingers. The witness said she was concerned about what to do, because her daughter's concerns about inappropriate sexual behavior around the time of the divorce were not believed. Dad did have supervised visitation for approximately eight or nine months post judgment.
Later, after the children returned from an unsupervised visit with their father, Christa became physically ill. Her mother called the witness in the middle of the night, and the next morning the child reported to her grandmother that she had been abused by their father. She accessed Yale New Haven Hospital. The children had been acting out problems in school CT Page 2337 after the criminal process began, and the children decompensated in some respects when court hearings are scheduled, or interviews are sought.
During cross-examination, the witness conceded that as grandmothers, she and the plaintiff had a good relationship, and talked about the allegations. Their relationship became stressed because the plaintiff denied that any abuse could occur in her home. The witness claimed that plaintiff said she had a perfect house. The grandmothers also had some conflict about the commencement of speech therapy, and who might be available to provide transportation to that therapy.
Mrs. Smith sought out the assistance of Yale New Haven Hospital after she learned from the school teachers that the children were acting out, and clearly needed some kind of intervention. She testified that she proceeded to make arrangements to have the children seen after discussing the matter with her daughter. She brought them to New Haven while her daughter was at work. She indicated that that was necessary because her daughter was the sole support of the children.
The witness was examined on the issue of the length of time between the disclosure of the abuse and her gathering of enough "support" to continue with an investigation. She replied that she waited one month. Not only were the defendant and the children not believed earlier, but she clearly understood the seriousness of the allegations and the upset that would be brought to bear on the entire family should the allegations be made public.
The defendant testified concerning the claimed abuse at the time of the parties' divorce. The defendant reported two incidents, one which concerned severe diaper rash, and the second being the discovery of a crystallized substance in Christa's hair which she suspected was dried semen. Dr. Mascoli's office also reported a vaginal infection to DCF. She went to the Sterling Center, which frustrated her because no one credited her concerns.
In December of 1990, the children began their articulations of sexual abuse. The defendant said that she wanted to stay in New Haven with the children, but her mother insisted that she not compromise her job by missing work because of the evaluation process. CT Page 2338
The defendant explained that they were counseled to explain to the children that the children were not at fault for what happened, that they allowed the children a punching bag to work out frustrations. She testified that they rarely talk about these events, but occasionally "out of the blue" they bring up these issues. They act out when confronted with the reality of court proceedings, and express fear at the prospect of seeing their paternal grandmother.
The child, Christa, saw a letter from the court, and reacted negatively. She is aware that her grandmother is asking the court for visitation. She testified that the termination of parental rights matter proceeded without opposition from Mr. Hammond, after she agreed to forego a Four Thousand ($4,000.00) Dollar arrearage of child support. She claimed that when the children were told that their father was no longer their father, they were relieved and happy.
On cross-examination, she conceded that the plaintiff was kind and helpful to her during the marriage and during the divorce, like a counselor. She was asked whether her former husband's plans to marry inspired her claims of sexual abuse. That was denied. She was asked if it was really her mother who instituted the claims which lead to the arrest of Mr. Hammond. She repeated that she and her mother acted together in bringing the allegations made by the children to the authorities. The evidence suggests, as indicated earlier, that the allegations were made to a speech therapist, and did not originate with mother or maternal grandmother.
The witness impressed the court as a tentative woman who has undergone the trauma of observing her children in severe pain at the hands of their father. She claimed extreme stress at the hands of her former husband, following an admission, on the record, of a psychiatric diagnosis from the Sterling Center, not made by a psychiatrist. The matter before this court is clearly not about custody. The defendant has been determined to be the sole remaining parent capable of raising these children safely.
What is critical to this court is a determination as to what is in the best interests of these children in light of paternal grandmother's insistence on pressing her claim for visitation. In a review of all of the evidence presented, and CT Page 2339 in light of the recommendation of Family Services, the court finds that it would not serve the continuing need of these children to heel to be forced to visit with the plaintiff. The plaintiff does not seem to recognize their rights independent of her needs.
The court feels that there is scant evidence to believe that this accomplished woman who seeks to visit her grandchildren actually abused those children. It is clear, however, that she lacks insight into her denial as to the abuse by her son. That could have serious and damaging repercussions on any relationship she might have with these children. The court feels that in the future, the existence of the cousins of these children should be made known to them within a therapeutic setting, and an introduction, perhaps beginning with correspondence should be contemplated. The court also believes that as the children age and mature, the subject of renewing a relationship with the plaintiff should be explored. That should occur only with some professional assistance. The court further orders that the defendant allow the children to renew a connection with the plaintiff if they ever ask to do that.
The claim for visitation is denied, and judgment in accordance with this memorandum of decision shall enter.
/s/ Dranginis, J. DRANGINIS